**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PROJECT ON GOVERNMENT OVERSIGHT, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE<br><br>Defendant. | ) | Civil Action No. 26-0039 (JMC) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... ii

**INTRODUCTION** .......... 1

**FACTUAL BACKGROUND** .......... 3

- **A. The September 2, 2025 Boat Strike** .......... 3
- **B. The Aftermath of the September 2, 2025 Boat Strike** .......... 4
- **C. The Trump Administrations Continued and Expanding Use of Boat Strikes** .......... 6

**PROCEDURAL BACKGROUND** .......... 7

**LEGAL STANDARDS** .......... 10

**ARGUMENT** .......... 12

- **I. DOD'S INVOCATION OF EXEMPTION 1 AS A BASIS TO WITHHOLD THE REQUESTED VIDEOTAPES LACKS ANY BASIS IN LOGIC OR FACT.** .......... 12
- **II. WITHOLDING THE REQUESTED VIDEO FOOTAGE CONTRAVENES SECTION 1.7(a) OF EXECUTIVE ORDER 13526.** .......... 17
- **III. DoD HAS FAILED TO SATISFY ITS SEGREGATION OBLIGATIONS** .......... 21

**CONCLUSION** .......... 23

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. U.S. Dep't of Justice*
655 F.3d 1(D.C. Cir. 2011) ........ 11
*Am. Oversight v. United States HHS*
101 F.4th 909 (D.C. Cir. 2024) ........ 11
*Campbell v. U.S. Dep't of Justice*
164 F.3d 20 (D.C. Cir. 1998) ........ 19
*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*
746 F.3d 1082 (D.C. Cir. 2014) ........ 10
*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*
58 F.4th 1255 (D.C. Cir. 2023) ........ 12
*CNN, Inc. v. FBI*
385 F. Supp, 3d 20 (D.D.C. 2019) ........ 19, 20
*Ctr. for Biological Diversity v. United States Forest Serv.*
Civ. No. 23-cv-00928 (DLF), 2025 U.S. Dist. LEXIS 59288, *9 (D.D.C. Mar. 28, 2025) ...... 12
*Dep't of State v. Ray*
502 U.S. 164 (1991) ........ 10, 11
*Inst. for Policy Studies*
885 F. Supp 2d at 139 ........ 15
*Johnson v. Exec. Office for U.S. Att'ys*
310 F.3d 771 (D.C. Cir. 2002) ........ 14
*Juarez v. Dep't of Justice*
518 F.3d 54 (D.C. Cir. 2008) ........ 14
*Judicial Watch, Inc. v. FDA*
449 F.3d 141 (D.C. Cir. 2006) ........ 12
*Judicial Watch, Inc. v. U.S. Dep't of Justice*
20 F.4th 49 (D.C. Cir. 2021) ........ 14
*Judicial Watch, Inc. v. U.S. Secret Serv.*
726 F.3d 208 (D.C. Cir. 2013) ........ 12
*Larson v. Dep't of State*
565 F.3d 857 (D.C. Cir. 2009) ........ 12
*Larson v. U.S. Dep't of State*
565 F.3d 857 (D.C. Cir. 2009) ........ 20
*Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*
826 F.3d 492 (D.C. Cir. 2016) ........ 13
*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977) ........ 13
*Mead Data Ctr., Inc. v. U.S. Dep't of the Air Force*
566 F.2d 242 (D.C. Cir. 1977) ........ 25

*Milner v. Dep't of the Navy*
562 U.S. 562 (2011) .......... 11
*Nat'l Lab. Relations Bd. v. Robbins Tire & Rubber Co.*
437 U.S. 214 (1978) .......... 10
*Nat'l Archives & Rec. Admin. v. Favish*
541 U.S. 157 (2004) .......... 11
*New York Times. Co. v. Dep't of Defense*
Civ. A. No. 25-9375 (VSB) (S.D.N.Y.) .......... 9
*Oglesby v. U.S. Dep't of Army*
920 F.2d 57, 68 (D.C. Cir. 1990) .......... 11
*Reps. Comm. for Freedom of the Press v. FBI*
3 F.4th 350 (D.C. Cir. 2021) .......... 14
*Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*
567 F. Supp. 3d 97 (D.D.C. 2021) .......... 13
*Rosenberg v. U.S. Dep't of Defense*
342 F. Supp. 3d 62 .......... 24
*U.S. Dep't of Justice v. Julian*
486 U.S. 1 (1988) .......... 15
*U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press*
489 U.S. 749 (1989) .......... 11
*Wolf v. CIA*
473 F.3d 370 (D.C. Cir. 2007) .......... 12, 15

**Statutes**

5 U.S.C. § 552(a)(4)(B) .......... 24
5 U.S.C. § 552(a)(8)(A)(i) .......... 14
5 U.S.C. § 552(b) .......... 13, 24
5 U.S.C. § 552(b)(1)(A-B) .......... 15

**Rules**

Fed. R. Civ. P. 56(a) .......... 12

**Other Authorities**

Executive Order (EO) 13526 .......... 16, 18, 20, 23

## INTRODUCTION

Over the past ten plus months Defendant Department of Defense (DoD), living up to its self-proclaimed moniker as the Department of War, and members of the Trump administration have made aggressive use of social media, including President Trump's Truth Social account, and government accounts to broadcast self-selected portions of at least 136 videos showing at least 325 lethal strikes by U.S. forces, many on boats in the Caribbean or Eastern Pacific.[1] Clearly designed to communicate the might of the United States, these videos tell a curated story of aggression against adversaries perceived or real.

This case concerns video footage of a lethal attack at sea, conducted on September 2, 2025, on a boat off the coast of Trinidad. President Trump released a video of the initial strike the day it occurred, writing on his social media account that 11 people had been "killed in action." Donald J. Trump (@realDomaldTrump), Truth Social, Sept. 2, 2025, https://truthsocial.com/@ reallDonaldTrump/posts/115136798909755892. Only months later did Congress and the public learn that two of those 11 were killed by a second missile strike on the same vessel. According to members of Congress who viewed the video footage of the second strike, it targeted "basically two shirtless people clinging to the bow of a capsized and inoperable boat, drifting in the water — until the missiles come and kill them.". *See* Ben Finley, "Pentagon watchdog to evaluate US military's boat strikes in Latin America, *AP News*, May 19, 2026, https://apnews.com/ article/boat-strike-pentagon-inspector-general-evaluation-targeting-72e9006c57aa .2c695744402934e4ca66 (quoting Rep. Adam Smith).

---

[1] Enclosed as Exhibit 1 is a list of the 136 videos Plaintiff has identified to date from public sources. The list includes links to the videotapes, the length of each videotape, how many strikes were involved in each videotape, and the date each was made publicly available and by which entity. Exhibit 1 also includes a spreadsheet lists the total number of videotapes Plaintiff has been able to locate from public sources.

Reportedly Adm. Frank M. "Mitch" Bradley issued the order to kill with the second strike to fulfill Secretary Hegseth's command that the military's attack destroy the boat and kill everyone. Alex Horton and Ellen Nakashima, "Hegseth order on first Caribbean boat strike, officials say: Kill them all," *Washington Post*, Nov. 29, 2025, https://www.washingtonpost.com/national-security/2025/11/28/hegseth-kill-them-all-survivors-boat-strike/. Adm. Bradley subsequently told members of Congress that portions of the video showing the killing of the two survivors could be publicly released without placing classified information at risk. Anne Flaherty, "Adm. Bradley tells lawmakers it's possible to release part of video of boat strike that killed survivors, Democrats say," *ABC News*, Dec. 17, 2025, https://abcnews.com/Politics/adm-bradley-tells-lawmakers-release-part-video-boat/story?id=128503095.

Since September 2, 2025, DoD has released more than 52 minutes of lethal strike video footage that omits any footage of the second boat strike on September 2, 2025, including the approximately 40 minutes of footage of the two survivors of the initial strike struggling to stay alive in the water and clinging to the boat's wreckage. Of the two and one-half hours of footage depicting the September 2 strikes, the government has released only 29 seconds from the first strike, claiming not a single second more can be released in the interests of national security.

The legality of the lethal strikes in general, and the September 2 strike on shipwrecked survivors in particular, is a matter of great debate and concern, especially given that the second strike was carried out against individuals who posed no immediate danger. To address those concerns, Plaintiff Project On Government Oversight, Inc. (POGO) filed a Freedom of Information Act (FOIA) request with DoD for the full video shown to Congress. In response and after months of stalling DoD finally claimed that the video is properly classified as "confidential—a downgrade from its purported earlier classification as TOP SECRET—and

therefore exempt from disclosure under FOIA Exemption 1. *See* Declaration of Ricky D. Buria (Buria Decl.) at ¶ 17 fn. 1 (ECF No. 17-2). Defendant has now moved for summary judgment, justifying its "confidential" classification as necessary to protect national security. But the extensive video footage of similar and numerous strikes in Iran and Africa as well as the footage of the first strike on September 2, 2025, that DoD already has made public completely undermine its newly minted classification claim that otherwise is not supported by fact or logic.

## FACTUAL BACKGROUND

*A. The September 2, 2025 Boat Strike.*

On September 2, 2025, the military launched a strike on a boat off the Trinidad coast. Ahead of that attack, Defense Secretary Pete Hegseth gave a verbal directive to kill everyone on board the vessel. Carrying out the order, the aircraft launched a missile that struck and ignited the boat. When two men were observed clinging to the wreckage, the Special Operations commander overseeing the attack, Adm. Frank M. "Mitch" Bradley, ordered a second strike, which killed the two shipwrecked survivors. *See, e.g.*, Horton and Nakashima, *Washington Post*, Nov. 29, 2025. Reportedly Adm. Bradley ordered the second strike to fulfill Secretary Hegseth's command that everyone on board the boat be killed. *Id. See also* Charlie Savage, Julian E. Barnes, Eric Schmitt and John Ismay, "Hegseth Ordered a Lethal Attack but Not the Killing of Survivors, Officials Say," *New York Times*, Dec. 1, 2025, https://www.nytimes.com/2025/12/01/us/hegseth-drug-boat-strike-order-venezuela.html.

In a post that same day on Truth Social President Trump justified the attack, which he described as against Tren de Aragua narcoterrorists, a group he called a "designated Foreign Terrorist Organization . . . responsible for mass murder, drug trafficking, sex trafficking and acts of violence and terror[.]" Donald J. Trump (@realDomaldTrump), Truth Social, Sept. 2, 2025,

https://truthsocial.com/@reallDonaldTrump/posts/115136798909755892. The President's post included a 29-second video showing U.S. aerial surveillance assets tracking the boat and the initial strike's impact from multiple angles and multiple degrees of magnification. *Id.* He also suggested the attack was the opening salvo in a campaign against drug traffickers. *Id.* On that same day Secretary of State Marco Rubio posted on X a 17-second video of the strike. https://x.com/marcorubio/status/1962992360822104110?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1962992360822104110%7Ctwgr%5E494a63d7e8e6234cce0ecefcba7f9e3ebfed1472%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.militarytimes.com%2Fnews%2Fyour-military%2F2025%2F09%2F02%2Fus-strikes-drug-carrying-vessel-that-departed-venezuela-trump-says%2F.

*B. The Aftermath of the September 2, 2025 Boat Strike.*

Although the Trump administration tried to justify the attack as part of an "armed conflict," many experts have suggested it was a murder or war crime, given the general lack of legal authorization for the lethal strikes and the fact that the second strike on September 2 killed two incapacitated individuals. Courtney Kube, Gordon Lubold and Raquel Coronell Uribe, "House and Senate committees launch inquiries into second strike on alleged drug boat," *NBC News*, Nov. 29, 2025, https://www.nbcnews.com/politics/national-security/house-senate-launch-inquiries-reported-second-strike-alleged-drug-boat-rcna246496. *See also* Horton and Nakashima, *Washington Post*, Nov. 29, 2025 (the alleged traffickers killed by the strike on September 2 posed no threat of imminent attack on the United States). The *New York Times* reported that the boat appeared to have turned around before the U.S. launched the attack, raising more questions about the strike's legality. Charlie Savage and Helene Cooper, "Boat Suspected of Smuggling Drugs Is Said to Have Turned Before U.S. Attacked It," *New York Times*, Sept. 10, 2025, https://www.ny

times.com/2025/09/10/us/trump-drug-boat-venezuela-strike.html ("[l]egal specialists have called it a crime to summarily kill suspected low-level smugglers").

The House and Senate Armed Services Committees launched investigations into the second September 2 strike. Patricia Zengerie, "Some US Republicans demand answers on Venezuela strikes, *Reuters*, Dec. 1, 2025, https://www.reuters.com/legal/government/some-us-republicans-want-answers-venezuela-strikes-despite-trump-2025-12-01/. On December 4, 2025, as part of those investigations, the Chairman of the Joint Chiefs of Staff Gen. Dan Caine and Adm. Bradley briefed the leaders of the House and Senate Armed Services and Intelligence Committees on President Trump's campaign against alleged drug trafficking boats, including the September 2 strike on the boat off the coast of Trinidad. At the briefing lawmakers were shown a video of the second September 2 strike that has not been made public. Kala Hubbard and Jaala Brown, "Lawmakers see video of second strike on boat survivors, say admiral testified there was no kill order," *CBS News*, Dec. 4, 2025, https://www.cbsnews.cnews/pentagon-briefing-congress-venezuela-alleged-drug-boats/.

According to Rep. Jim Himes, who viewed the video, what he saw "was one of the most troubling things I've ever seen in my time in public service." *Id.* He went on to say, "Any American who sees the video that I saw will see the United States military attacking shipwrecked sailors—bad guys, bad guys—but attacking shipwrecked sailors . . . They were not in a position to continue their mission in any way." *Id.* Sen. Chris Coons, who also attended the briefing, stated that after seeing the video he has "more policy questions that ever" about the mission. *Id.*

The September 2 strike has raised bipartisan concerns about its legality and widespread public concern. *Id.* Although President Trump stated he would support releasing the video of the strike, *id.*, Defense Secretary Pete Hegseth made it clear that the Pentagon will not release the

video of the September 2 strike shown to Congress. Lara Seligan, Anvee Bhutani, and Shelby Holliday, "Hegseth: Pentagon Won't Release Full Video of September 2 Boat Strike," *Wall Street Journal*, Dec. 16, 2025, https://www.wsj.com/politics/national-security/pete-hegseth-boat-strike-video-no-release-28feb869?mod=hp_lead_pos2. To date, but for the 29 seconds posted by President Trump, the video has not been released to the public.

*C. The Trump Administrations Continued and Expanding Use of Boat Strikes.*

Since the September 2 boat strike U.S. forces have hit dozens and dozens of other boats in the Caribbean, the Pacific Ocean, Iran, and launched strikes against ISIS fighters in Africa that they have documented in video and made public in posts on the social media accounts of numerous government and senior government officials, including President Trump's Truth Social account. *See* Exhibit 1. While the exact number of individuals killed by these strikes is not publicly available, it was reported in August 2026 that boat strikes had killed at least 221 individuals alleged to be engaged in drug smuggling. Piper Hudspeth Blackburn, "'They are murder victims': Senator suggests US strikes have killed people who weren't involved in drug trafficking, *CNN.com*, Aug. 3, 2026, https://www.cnn.com/2026/08/03/politics/tim-kaine-boat-strikes-illegal.

Since the September 2, 2025 strike DoD has shown it has the capability to rescue survivors. For example, as stated in the explanation accompanying the posted video of a boat strike DoD conducted on June 16, 2026,

> at the direction of #SOUTHCOM commander Gen. Francis L. Donovan, Joint Task Force Southern Spear conducted a lethal kinetic strike on a vessel operated by Designated Terrorist Organizations. Intelligence confirmed the vessel was transiting along known narco-trafficking routes in the Eastern Pacific and was engaged in narco-trafficking operations. One male narco-terrorists was killed during this action, and there were two male survivors. *Following the engagement, USSOUTHCOM immediately notified U.S. Coast Guard to activate the Search and Rescue system for the survivo*rs. No U.S. military forces were harmed.

Exhibit 1, No. 23 (emphasis added). By contrast, DoD failed to employ the Search and Rescue system on September 2, 2025, instead killing the two remaining survivors from the first strike with no apparent justification.

## PROCEDURAL BACKGROUND

On December 4, 2025, POGO submitted a FOIA request to DoD's Office of the Secretary of Defense using the online portal FOIA.gov. Complaint ¶ 24. Plaintiff specifically requested an electronic copy of the complete video (or videos) shown to lawmakers on the House and Senate armed services and intelligence committees on December 4, 2025, as part of a briefing that included General Dan Caine, chairman of the Joint Chiefs of Staff, and Navy Admiral Frank "Mitch" Bradley, head of Special Operations Command. *Id.* ¶ 25. POGO's request noted that both Senator Tom Cotton, chairman of the Senate Select Committee on Intelligence, and Representative Jim Himes, ranking member of the House Permanent Select Committee on Intelligence, have publicly discussed the video. POGO further explained that the video (or videos) is of September 2, 2025 strikes by U.S. forces on a boat and survivors off the coast of Trinidad. *Id.* ¶ 26.

POGO requested a fee waiver explaining that it has no commercial interest in the requested records, which will serve the public interest by contributing to shedding light on matters involving federal operations, government integrity, and compliance with the law at the highest levels, namely Secretary of Defense Pete Hegseth and Adm. ley. *Id.* ¶ 27. The requested records will also shed light on whether U.S. military strikes on shipwrecked survivors at sea violated the law. POGO further explained that release of the requested records will significantly advance what the public knows about the incident and will shed light on officials' statements about the lawfulness of the strikes. *Id.*

POGO also requested expedited processing of its FOIA request because the information in the requested documents is urgently needed to inform the public concerning some actual or alleged government activity. *Id.* ¶ 28. As POGO explained in justifying its request for expedition, the subject of its request is of widespread and exceptional media interest and as well as bipartisan concern in Congress and the information sought involves possible questions about the government's integrity that affect public confidence. The subject implicates potential disregard for laws regarding killing shipwrecked survivors and the use of the U.S. military to take the lives of people who may pose no threat. *Id.* ¶ 29. In further support of its expedition request POGO provided numerous links to public reporting about the incident underlying POGO's FOIA request. *Id.* ¶ 30.

According to DoD's FOIA portal, in December 2025, DoD granted POGO's request to expedite POGO's December 4, 2025 FOIA request submitted to DoD's Office of the Secretary. *Id.* ¶ 31.

On December 4, 2025, POGO submitted via the online portal an identical FOIA request to DoD's U.S. Special Operations Command. POGO also requested a fee waiver and expedited processing of this request based on the identical justifications it provided for its December 4, 2025 request of DoD's Office of the Secretary. *Id.* ¶ 33.

On January 6, 2026, having received no response from DoD on either request, Plaintiff filed suit against DoD. *See* ECF No. 1. Defendant's answer, filed on February 11, 2026, denied all legal claims but made no mention of any reliance on Exemption 1. *See* ECF No. 7. Thereafter, the parties filed a series of court-ordered joint status reports in which DoD made continuing promises about a final processing date that it failed to meet and took actions that suggested it was pursuing a delay tactic.

In the first Joint Status Report, filed on March 27, 2026 (ECF No. 9), DoD represented that it continued to process the requests, that it anticipated providing Plaintiff and the Court with an updated response within approximately 30 days, but that "a complete release to Plaintiff within that timeframe may not be feasible." *Id.* at ¶ 4.

On May 4, 2026, the parties filed another Joint Status Report (ECF No. 11). DoD represented that it had made "significant progress toward completing processing," that a two-star general at USSOUTHCOM was reviewing the videotapes, and that a determination about releasability would require consultation with the Office of the Secretary of Defense. *Id.* at ¶ 4. DoD further represented that it anticipated making a final determination "on or about mid-May." *Id.* at ¶ 5.

Two weeks later, on May 19, 2026, DoD abruptly moved to stay all proceedings in this case pending the outcome of another lawsuit, *New York Times. Co. v. Dep't of Defense*, Civ. A. No. 25-9375 (VSB) (S.D.N.Y.). DoD claimed a stay would serve the interests of judicial efficiency and fairness to the parties. *See* ECF No. 13. Plaintiff opposed the stay, ECF No. 14, and by Minute Order issued on June 3, 2026, the Court denied Defendant's motion to stay. The Court reasoned that "[a] different plaintiff's litigation of a related case in a different forum is not a sufficient ground to bar this Plaintiff from litigating its own case in the forum of its choosing." *Id.*

On that same day the parties filed another Joint Status Report (ECF No.15). Defendant stated that although DoD had yet to issue a formal determination letter, its counsel had advised Plaintiff's counsel on May 13, 2026, "that Defendant determined that it would not be making any further release of the requested videos and withheld them pursuant to FOIA Exemption 1." *Id.* ¶ 3. On June 4, 2026, DoD transmitted its final determination that the non-public portions of the

requested video or videos were being withheld pursuant to FOIA Exemption 1. *See* Def. Exhibit B (ECF No. 17-3).

In short, POGO had to wait five and one-half months after submitting identical FOIA expedited requests for a discrete and highly controversial videotape—requests that DoD claimed in its stay motion were sufficiently similar to those at issue in an earlier filed lawsuit—before DoD advised POGO informally that it was asserting Exemption 1 to justify withholding all non-public portions of the requested videotape footage.

**LEGAL STANDARDS**

The FOIA "was enacted to facilitate public access to Government documents" to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Lab. Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). This compelling statutory purpose requires the Court to "bear in mind that FOIA creates a 'strong presumption in favor of disclosure.'" *Ray*, 502 U.S. at 173. The statute therefore has a clear "prodisclosure purpose." *Nat'l Archives & Rec. Admin. v. Favish*, 541 U.S. 157, 174 (2004). *See also Am. Oversight v. United States HHS*, 101 F.4th 909, 913 (D.C. Cir. 2024) (cleaned up) (recognizing FOIA's "'goal of broad disclosure.'").

As a result, "the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *Ray*, 502 U.S. at 173. Courts decide FOIA cases *de novo*, and the government bears the burden of justifying its decision to

withhold records. *U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). A "strong presumption in favor of disclosure" animates FOIA and its exemptions must be "narrowly construed." *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) (citations omitted); *see Milner v. Dep't of the Navy*, 562 U.S. 562, 571 (2011) (claims of exemption are to be given a "narrow compass").

Where exemptions are asserted, the agency must provide affidavits or declarations that are "reasonably detailed," "nonconclusory," and "submitted in good faith." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 58 F.4th 1255, 1262 (D.C. Cir. 2023) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). Moreover, "an agency's justification for invoking a FOIA exemption . . . is sufficient if it appears 'logical' or 'plausible'." *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007).

Summary judgment is the typical procedural mechanism for resolving disputes under the FOIA. Fed. R. Civ. P. 56(a); *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013); *see Ctr. for Biological Diversity v. United States Forest Serv.,* Civ. No. 23-cv-00928 (DLF), 2025 U.S. Dist. LEXIS 59288, *9 (D.D.C. Mar. 28, 2025) ("the vast majority of FOIA cases can be resolved on summary judgment.") (cleaned up). Unlike in ordinary civil litigation, FOIA plaintiffs are not required to demonstrate an absence of genuine factual disputes to prevail at summary judgment. Rather, they need only show that the government has failed to meet its

statutory obligations. *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 106 (D.D.C. 2021). And, as in non-FOIA cases, Courts must assess "the evidence in the light most favorable to the non-movant and draw all reasonable inferences accordingly." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).

Even where a FOIA exemption applies, an agency may withhold information only if it also satisfies two additional requirements: segregability and foreseeable harm. Under the FOIA's segregability mandate, "[a]ny reasonably segregable portion of a record shall be provided…after deletion of the portions which are exempt." 5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). Agencies must conduct a line-by-line review of each document and may not rely on general assertions that a document is exempt in its entirety to satisfy the segregability requirement. *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008); *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002).

In addition, the 2016 FOIA Improvement Act imposes a separate, independent obligation on agencies to show "foreseeable harm" from disclosure. 5 U.S.C. § 552(a)(8)(A)(i); *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021). An agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials," and must "connect the harms in a meaningful way to the information withheld." *Id.* Boilerplate or speculative assertions of harm are insufficient. *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 20 F.4th 49, 55 (D.C. Cir. 2021).

## ARGUMENT

### I. DOD'S INVOCATION OF EXEMPTION 1 AS A BASIS TO WITHHOLD THE REQUESTED VIDEOTAPES LACKS ANY BASIS IN LOGIC OR FACT.

Following the "narrow" construction the Supreme Court accords FOIA exemptions, *Inst. for Policy Studies,* 885 F. Supp 2d at 139 (quoting *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)), an agency's reliance on Exemption 1 to withhold documents, like all the other exemptions, requires a sufficient explanation from the agency of why and how a specific exemption supports the defense. *See id.* Here, DoD relies on Exemption 1 to justify its classification of the withheld videotapes as "confidential" and therefore beyond the reach of the FOIA. But its explanation for that classification, which is supported only by a declaration from Ricky D. Buria, Secretary Hegseth's chief of staff, must be "logical or plausible." *Wolf*, 473 F. 3d at 374-75 (cleaned up). Mr. Buria's declaration does not clear that bar.

Exemption 1 allows agencies to withhold records that are "established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1)(A-B). The relevant Executive Order Defendant relies on here, Executive Order 13526, expressly recognizes the right of the "American people [to] be informed of the activities of their government . . . [and that] our Nation's progress depends on the free flow of information both within the Government and to the American people." Exec. Order No. 13526, 75 C.F.R. § 707. Critically, it seeks to strike a balance between disclosing information to the public and protecting the "information critical to our Nation's security." *See id.* Section 1.1 establishes how to classify such records.

To meet its burden here DoD relies exclusively on the Buria Declaration to which it asks the Court essentially to accord unquestioned deference. But deference is not warranted here where the vague and generalized claims of harm that Mr. Buria asserts lack factual support and defy commonsense.

According to Mr. Buria, DoD has classified the withheld video portions as "confidential" – after downgrading them from "TOP SECRET" – based on the claim that they meet the requirements of section 1.4(a) of Executive Order (EO) 13526 as pertaining to military plans, weapons systems, or operations, and section 1.4(g) of the EO as revealing "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security." Buria Decl. ¶¶ 7 fn. 1, 11. In justifying DoD's reliance on section 1.4(a) Mr. Buria describes the withheld videos as displaying "active military operations" that, if revealed would disclose "specific operational and targeting capabilities" and the "effectiveness of munitions" that would allow adversaries "to develop countermeasures[.]" *Id.* ¶ 13.

These broad assertions, however, completely ignore that the government, to serve the messaging goals of President Trump and his administration, already has made public at least 136 videos showing at least 325 lethal strikes by U.S. forces on boats on foreign soil. *See* Exhibit 1. The released videos reveal specific targets and document the effectiveness of the munitions DoD has used at least 325 times to destroy boats. The video footage of the September 2 strikes, in particular, has been described as a video feed focused on a boat in the Caribbean and showing missiles striking that boat and the people on it, including survivors of an initial strike struggling to stay alive by clinging to wreckage. This is not a video tracking a missile over an extended period of time—so-called "specific operational and targeting capabilities" DoD claims it seeks to protect.

Indeed, it has been well known for more than a decade that the U.S. has aerial surveillance platforms that can loiter over areas for hours at a time and track specific moving targets. The government has already acknowledged striking the boat with multiple missiles,

meaning it is no secret that one missile strike was deemed insufficient by military leaders. If there are parts of the video that contain sensitive information, such as a missile being released from a delivery vehicle or traveling over the sea for an extended period of time in ways qualitatively different than what can already be seen in the public footage DoD officially released, those portions can be blurred or segregated.

In short, DoD has provided no adequate justification for withholding the entirety of the two and one-half hours of requested footage minus the short video posted by President Trump. DoD has also failed to justify withholding similarly short clips of the boat turning around before the first missile strike, the survivors of the initial strike struggling to stay alive, or the second missile strike killing them, the disclosure of which would implicate no legitimate national security concerns.

Mr. Buria's declaration also lacks any persuasive explanation of how the withheld video footage differs in any material effect from the 136 plus publicly disclosed videos and would therefore, if disclosed, reveal something different than DoD already has made public. His conclusory assertion that the withheld portions of the videotape shown to Congress are "distinguishable" from what DoD made public, Buria Decl. ¶ 10, rests solely on his sweeping claim that they would "provide[] insight into the optical tools utilized and their limitations" and would therefore be "useful" to adversaries seeking to defeat or degrade those tools. *Id.* ¶ 9. But the obstacle Mr. Buria must clear is an explanation for why and how the withheld footage provides more information on the "optical tools utilized and their limitations" than the footage of the September 2, 2025 boat strike DoD already has released.[2] The answer clearly is that the only

[2] Mr. Buria's vague declaration also ignores the significant amount of information, including other videos, that the U.S. military and its defense contractors have publicly disclosed over the decades and even in recent months about their technical surveillance and tracking capabilities.

material difference between the two is that the withheld footage reveals conduct by DoD that is at least questionably illegal.

Mr. Buria's explanation for why section 1.4(g) of the EO applies suffers from similar deficiencies. He states only that the withheld video footage "relates to the military's ability to acquire or track vessels of interest, deliver accurate munitions, and assess the aftermath of those strikes." Buria Decl. ¶ 14. But that same description applies equally to the 136 videos DoD already has made public, as they reflect the "vessels of interest" and the accuracy of DoD's munitions—capabilities President Trump in fact touted in his September 2, 2025 Truth Social post. They also provide an assessment of the aftermath. For example, the posted description of the videotape in Exhibit 1 No. 23, states in relevant part: "One male narco-terrorists was killed during this action, and there were two male survivors."

In sum, simply parroting the relevant language of EO 13526, as DoD has done here, does not satisfy its evidentiary burden. Mr. Buria's declaration puts no meat on the bare skeletal explanation DoD has offered and is contradicted by the 136 plus videos, and other information, already in the public domain.[3] Indeed, the declaration raises more questions than it answers, such as what specific tactics and procedures would be exposed by disclosing the full video and how the release of the full video would allow adversaries to develop countermeasures that they cannot

---

For instance, just months ago, DoD posted over four minutes of camera footage taken from a MQ-9 Reaper during a training mission at the National Training Center, Fort Irwin, Calif., on May 13, 2026. https://www.dvidshub.net/video/1016162/mq-9-reaper-training-feed-footage.

[3] Tellingly Defendant's 16-page brief devotes less than two pages to justifying the classification of the withheld video footage.

do based on the 136 plus videotapes already at their disposal. With no answers to those questions DoD's explanation for its classification decision fails to carry its evidentiary burden.[4]

DoD's brief attempts to fill in these gaping holes with a plea for nearly absolute deference. As the D.C. Circuit has recognized, however, the deference accorded agency declarations "is not equivalent to acquiescence." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). Nor does the significant deference courts accord declarations in Exemption 1 cases usurp the reviewing court's role to ensure a defendant has carried its evidentiary burden. Rather, an agency's supporting declarations must provide the court with "an adequate foundation to review the soundness of the withholding." *Id.* (cleaned up).

Here, DoD attempts to meet that burden with "abstract and conclusory statements about national security untethered to the specific information withheld." *CNN, Inc. v. FBI*, 385 F. Supp, 3d 20, 38 (D.D.C. 2019). As in *CNN*, however, "[t]hat is plainly not enough to carry its burden." *Id. See also Larson v. U.S. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) ("conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden").

## II. WITHOLDING THE REQUESTED VIDEO FOOTAGE CONTRAVENES SECTION 1.7(a) OF EXECUTIVE ORDER 13526.

Section 1.7(a) of EO 13526 places prohibitions and limitations on an agency's ability to classify information. As provided therein, "[i]n no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error[.]" *Id.* at § 1.7(a)(1). The EO also prohibits classifying

---

[4] For these same reasons, DoD's conclusory and unsupported claims of harm fail to satisfy its burden to show that foreseeable harm would result from disclosure of the withheld video footage.

information to "prevent embarrassment to a person, organization, or agency." *Id.* at § 1.7(a)(2). The evidence to date strongly suggests, if not demonstrates, that DoD has classified videotape footage from the second September 2 boat strike to conceal evidence of illegality and to prevent embarrassment from revealing its highly controversial actions, all in contravention of section 7(a) of EO 132526.

Legal experts have concluded the order to kill directed at two incapacitated individuals who posed no imminent threat of harm was illegal. Courtney Kube, Gordon Lubold and Raquel Coronell Uribe, "House and Senate committees launch inquiries into second strike on alleged drug boat," *NBC News*, Nov. 29, 2025, https://www.nbcnews.com/politics/national-security/house-senate-launch-inquiries-reported-second-strike-alleged-drug-boat-rcna246496. *See also* Horton and Nakashima, *Washington Post*, Nov. 29, 2025 (the alleged traffickers killed by the strike on September 2 posed no threat of imminent attack on the United States). *See also* Charlie Savage and Helene Cooper, "Boat Suspected of Smuggling Drugs Is Said to Have Turned Before U.S. Attacked It," *New York Times*, Sept. 10, 2025, https://www.nytimes.com /2025/09/10/us/trump-drug-boat-venezuela-strike.html ("[l]egal specialists have called it a crime to summarily kill suspected low-level smugglers"). Reinforcing this conclusion, the *New York Times* reported that the boat appeared to have turned around before the U.S. launched the attack, raising more questions about the second strike's legality. *Id.*

According to former Department of Justice official Marty Lederman, the strikes are "so manifestly unlawful that in any other administration, including Trump's first, if anyone had even dared to propose it, virtually any and every attorney who got wind of it . . . would have immediately dismissed it as obviously out-of-bounds." Marty Lederman, "The Many Ways in Which the September 2 Caribbean Strike was Unlawful . . . and the Grave Line the Military Has

Crossed," *Just Security*, Sept. 10, 2025, https://www.justsecurity.org/120296/many-ways-caribbean-strike-unlawful. Mr. Lederman's analysis details the many violations of law the Trump Administration committed with the second September 2 boat strike as well as a violation of a longstanding DoD policy to "never target civilians with lethal force." *Id. See also* Michael Schmitt, Ryan Goodman and Tess Bridgeman, "Unlawful Orders and Killing Shipwrecked Boat Strike Survivors: An Expert Backgrounder, *Just Security*, Dec. 1, 2025, https://www.justsecurity.org/125948/illegal-orders-shipwrecked-boat-strike-survivors/; Charlie Trumbull, "The Administration's Drug Boat Strikes Are Crimes Against Humanity," *Lawfare*, Dec. 16, 2025, https://www.lawfaremedia.org/article/the-administration-s-drug-boat-strikes-are-crimes-against-humanity; Adam Isacson and John Walsh, "Killing Spree: Extrajudicial executions in the U.S. boat strikes campaign," *WOLA*, Jul. 24, 2026, https://www.wola.org/analysis/killing-spree-extrajudicial-executions-in-the-u-s-boat-strikes-campaign/#sec-11.

Other revelations reinforce the conclusion that the second September 2 strike likely violated the law. Reportedly the aircraft DoD used to strike the boat was "painted to look like a civilian plane" and "carried its munitions inside the fuselage, rather than visibly under its wings[.]" Charlie Savage, Eric Schmitt, John Ismay, Julian E. Barnes, Riley Mellen, and Christiaan Triebert, "U.S. Attacked Aircraft That Looked Like a Civilian Plane," *New York Times*, Jan. 12, 2026, https://www.nytimes.com/2026/01/12/us/politics/us-boat-attacks-law.html?smid=nytcore-ios-share. President Trump has defended the lawfulness of this and other boat strikes by declaring to Congress that the U.S. "is engaged in a formal 'armed conflict' with drug cartels . . . and that suspected smugglers" for drug cartels the administration has labelled "terrorist organization" are "unlawful combatants[.]" Charlie Savage and Eric Schmitt, "Trump 'Determined' the U.S. Is Now in a War With Drug Cartels, Congress Is Told," *New York Times*,

Oct. 2, 2025, https://www.nytimes.com/2025/10/02/us/politics/trump-drug-cartels-war.html. But, as the *New York Times* notes, "the laws of armed conflict prohibit combatants from feigning civilian status to fool adversaries into dropping their guard, then attacking them and killing them . . . a war crime called 'perfidy.'" Savage, Schmitt, Ismay, Barnes, Mellen, and Triebert, *New York Times*, Jan. 12, 2026.

The strike has also drawn the attention and bipartisan concern of Congress. Rep. Jim Himes, who viewed the video, described what he saw "was one of the most troubling things I've ever seen in my time in public service." Hubbard and Brown, *CBS News*, Dec. 4, 2025. In a recent floor speech Sen. Tim Kaine decried the illegality of DoD's use of the military to launch strikes at boats in international waters, and the administration's use of classification to "cloak" the campaign in secrecy. 119 Cong. Rec. S4320 (daily ed. Jul. 29, 2026), Vol. 172, No. 124, at 10, https://www.congress.gov/119/crec/2026/07/29/172/124/CREC-2026-07-29-pt1-PgS4311.pdf. Sen. Kaine explained the administration's reasons for secrecy as follows:

> The President and the Pentagon don't want the American public to see what is being done in our name and with our tax dollars. They are trying to hide from the public—and even from this body—the flimsiness of the legal case and the exorbitant cost and ineffectiveness of the operation.
>
> For example, the Pentagon is glad to show edited videos of an exploding boat to pat itself on the back about its lethality toward narcotraffickers. They proudly did so on social media, and all over mainstream media, following the first fatal strike of a boat last September—September 2.
>
> But months after the administration produced this PR video of a fatal strike, it was revealed that the full video—the unedited video—also showed struggling survivors clinging to the boat's wreckage and seeking to be rescued.
>
> In a violation of U.S. and international law, the United States returned to the site in open international waters and killed the survivors.

*Id.* at 10-11.

In the face of these serious questions about the lawfulness of the September 2 boat strikes DoD's classification of information that would go a long way toward answering those questions raises the reasonable conclusion that the classification was intended to conceal violations of law. This contravenes EO 13526, leaving Defendant with no legal justification for its Exemption 1 claim.

Defendant's conduct in this litigation reinforces the conclusion that DoD is delaying publication of the requested video footage to avoid embarrassment and revealing confirmation of illegal conduct. Despite the clarity and narrow scope of Plaintiff's FOIA request DoD delayed its response for nearly six months even though it agreed POGO was entitled to expedition. At no time in that period did DoD even suggest the video footage was classified. Instead, the agency made representations to Plaintiff and the Court about likely processing and production dates that proved to be false. DoD sought to delay these proceedings indefinitely with its ultimately unsuccessful motion to stay. Only after that gambit failed did DoD finally disclose its position that the requested footage was protected by Exemption 1.

Finally, if the Court is not prepared to order disclosure of the withheld video footage based on the current record, it should review the footage *in camera* to determine whether DoD has satisfied the statutory requirements for withholding. *See Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62, 79 (*in camera* review to determine if agency met foreseeable harm requirement). At a minimum, the Court should review the video footage showing the second strike, which is the footage that has raised the most concerns about the legality of DoD's actions.

## III. DoD HAS FAILED TO SATISFY ITS SEGREGATION OBLIGATIONS.

The FOIA imposes on agencies the duty to segregate and release to FOIA requesters all "reasonably segregable portion[s]" of the requested records. 5 U.S.C. § 552(b). As Amended by

section 2 of the FOIA Improvement Act of 2016, the FOIA explicitly requires agencies to "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible." 5 U.S.C. § 552(a)(8)(A)(ii). The FOIA further imposes on reviewing courts an affirmative duty to assess whether an agency has met its segregation obligations. 5 U.S.C. § 552(a)(4)(B).

Defendant here has failed to show that, except for the 29 seconds of footage publicly released by President Trump on September 2, 2025, none of the remaining two and one-half hours of video footage shown to Congress can be disclosed. This omission is fatal to Defendant's summary judgment motion.

Defendant relies on the Buria Declaration to justify its failure to further segregate the requested video footage. But again Mr. Buria's sweeping, conclusory, and unsupported assertions fall short of the evidence the FOIA requires. And they rest on his speculation of what "could" occur from disclosure speculation, not what is likely to occur.

For example, Mr. Buria asserts that "the full-length footage *could* disclose [sic] classified information[.]" Buria Decl. ¶ 16 (emphasis added). Similarly, he states that releasing the withheld segments "alongside the full-length videos *could* reveal classified information that is inextricably intertwined with the overall video display." *Id.* (emphasis added). This is far from the "detailed justification" the FOIA requires to demonstrate that all the non-produced material is not reasonably segregable. *Mead Data Ctr., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).

While Mr. Buria makes passing reference to redacting, he fails to offer any persuasive explanation for why redacting and blurring out certain images—a technique DoD widely uses as evidenced in the 136 plus videos released to date—would not be an adequate solution to prevent

the disclosure of properly classified materials. Instead, he makes the completely conclusory claim that even with redaction, releasing even one second more than the 29-second footage of video from multiple angles and multiple degrees of magnification that has already been released "would give damaging insight into current imaging capabilities and military strike precision." Buria Decl. ¶ 17. Again, however, this is woefully short of the "detailed justification" the FOIA requires and asks the Court to accept DoD's bald, unsupported speculation with nothing to back it up. And it ignores the fact that the 29-second video posted by the President was taken from multiple angles and multiple degrees of magnification.

As for the specific footage of the second September 2 strike, Mr. Buria relies solely on the fact that it has not been previously released—a fact that, in and of itself, does not satisfy DoD's segregation obligations. *Id.* He further suggests there are "unique considerations with such events," listing "the potential to disclose the effectiveness of munitions, damage assessments, and U.S. military decision-making relating to follow-up actions." *Id.* Not only is this purported justification at such a level of unsupported generality as to be useless, but it is demonstrably false as discussed *supra*.

In sum, Mr. Buria's conclusion that "no reasonable segregation and release of non-exempt information is possible beyond what is already in the public domain," *id.* at 18, lacks any support and fails to provide the "detailed justification" this Court needs to properly conclude Defendant has met its statutory duty to segregate all non-exempt material.[5]

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be denied and Plaintiff's cross-motion for summary judgment should be granted.

[5] DoD also argues it conducted an adequate search, something Plaintiff does not dispute.

Respectfully submitted,

*/s/ Anne L. Weismann*_
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, N.W., Suite 640
Washington, D.C. 20015
Phone: 301-717-6610

Dated: August 6, 2026

Weismann.anne@gmail.com